NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4368-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILLIAM J. THOMAS,
a/k/a WILLIAM THOMAS,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**January 19, 2022**

**APPELLATE DIVISION**

Argued November 17, 2021 – Decided January 19, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 80-12-1541.

Joseph J. Russo, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Joseph J. Russo, of counsel and on the briefs).

Lauren Bonfiglio, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Lauren Bonfiglio, of counsel and on the brief).

The opinion of the court was delivered by

GEIGER, J.A.D.

Defendant William J. Thomas appeals from an August 2020 Law Division order denying his motion to for a Miller[1] hearing to correct an unconstitutional life sentence he received for a double murder he committed at age seventeen. Defendant was initially eligible for parole after serving thirteen years. Contending that parole data showed that mere eligibility for parole did not provide him a meaningful opportunity for release based on demonstrated maturity and rehabilitation, defendant argued he had the right to an adversarial hearing for the court to consider the juvenile offender sentencing factors enumerated in Miller, 567 U.S. at 477-78.

The record demonstrates that defendant has remained infraction-free during the forty years he has been incarcerated, completed programs to address his behavior and substance abuse, attained a GED and vocational skills, and been found to be at low risk of recidivism by numerous evaluating psychologists. Despite these circumstances, defendant has been denied parole and received lengthy future eligibility terms (FET) seven times.

In an issue of first impression, we hold that defendant, who has now been imprisoned for more than four decades even though his sentence did not impose a specified period of parole ineligibility, has the constitutional right to an adversarial hearing to determine whether defendant "still fails to appreciate

_____

[1] Miller v. Alabama, 567 U.S. 460 (2012).

risks and consequences, and whether he has matured or been rehabilitated," utilizing the procedure recently adopted by our Supreme Court in State v. Comer, ___ N.J. ___, ___ (2022) (slip op. at 6-7). Accordingly, we reverse and remand for the trial court to conduct that adversarial hearing.

We derive the following facts from the record. On May 6, 1980, defendant, who was seventeen years old, and his nineteen-year-old cousin, William Mancuso, murdered two teenage acquaintances, Lee Miller and June Johnson, who were hitchhiking. Defendant and Mancuso had been drinking alcohol, smoking marijuana, and using methamphetamines. Mancuso drove the group to a wooded area in Egg Harbor Township where defendant murdered the two teens, using a tire iron as a weapon.

Mancuso saw Johnson sitting on the ground when defendant began striking her head and upper torso with a tire iron. The female victim attempted to flee, at which time Mancuso joined the attack. When Miller attempted to defend Johnson, defendant struck him with the tire iron. The two later died from their injuries.

The next morning, defendant, claiming no memory of the attack, left the state after Mancuso described what had happened. According to defendant, he was extremely drunk and high at the time of the murders and still does not

3

remember most of the details of his crimes. Defendant thereafter enlisted in the Army and was transferred to Germany.

Mancuso confessed to police and identified defendant as the other perpetrator. Defendant was extradited and arrested in July 1981. Later that month, the trial court granted the State's motion to waive defendant to adult court. The waiver statute then in effect provided that the juvenile court may involuntarily waive jurisdiction if the State demonstrated that there was probable cause that a juvenile over age fourteen had "committed a delinquent act which would constitute homicide . . . if committed by an adult," N.J.S.A. 2A:4-48, and "together with the absence of any reasonable prospects of rehabilitation of the juvenile" by age twenty-one, State in the Int. of C.A.H., 89 N.J. 326, 330 (1982).

In August 1981, an Atlantic County grand jury returned an indictment charging defendant with unlawful possession of a weapon (the tire iron), N.J.S.A. 2C:39-4(d) (count one); and two counts of knowing murder, N.J.S.A. 2C:11-3(a)(2) (counts two and three).

On February 1, 1982, defendant entered a non vult plea[2] to the murder counts. On February 19, 1982, defendant was sentenced to concurrent life

_____

[2] Under the then-existing statutory scheme, a defendant was not permitted to plead guilty to an indictment for murder. State v. Brown, 22 N.J. 405, 414

sentences with no parole disqualifiers. Defendant, who had been incarcerated since July 27, 1981, was awarded 207 days of jail credits. He is now fifty-eight years old.

During the sentencing hearing, the judge noted that Mancuso and defendant "stand before this [c]ourt as youthful offenders without adult or juvenile records." The judge made clear that he "failed to impose any minimum parole eligibility and elected not to impose consecutive terms because of the defendant's age, his lack of any prior arrests, his pursuit of a productive career, and his admission of guilt which is generally recognized as the first step to rehabilitation."

Mancuso pled guilty only to the murder of Johnson in return for the State's recommendation that he be sentenced to ten years in prison. On the record, the State explained that the reason for its recommendation was because Mancuso cooperated with law enforcement and exhibited a genuine sense of remorse. According to the State, defendant exhibited no such remorse. Mancuso was sentenced in accordance with the plea agreement to a ten-year

_____

(1956). Instead, a defendant could plead non vult or nolo contendere, in which case, "the sentence . . . shall be either life imprisonment or that imposed for murder in the second degree, i.e., imprisonment for not more than 30 years." Id. at 414-15 (citing N.J.S.A. 2A:113-3, -4).

A-4368-19

term.[3]  Notably, the judge did not accept the State's theory that Mancuso was merely an accomplice.

In 1997, defendant sought post-conviction relief (PCR), alleging ineffective assistance of counsel during the juvenile waiver hearing and that his sentence was illegal due to the disparity of his sentence and Mancuso's ten-year term.  On June 13, 1997, the trial court issued an oral decision that rejected both grounds raised by defendant without conducting an evidentiary hearing.

Defendant first became eligible for parole in May 1995, thirteen years after he was sentenced.  He was denied parole and received a 120-month FET.  Thereafter, defendant was denied parole six more times, most recently on December 16, 2020.[4]  Defendant appealed several of the New Jersey State Parole Board's (Board) final decisions.

---

[3] We recognize the striking disparity between the two codefendants' sentences and note that it appears inconsistent with current standards.  See State v. Roach (Roach III), 167 N.J. 565, 570 (2001) (disapproving of "grievous inequities in sentence[ing]" among similarly situated codefendants (quoting State v. Hicks, 54 N.J. 390, 391 (1969))).  Standing alone, this disparity is not a basis to grant a Miller hearing, but it has resulted in defendant being imprisoned more than four times longer than Mancuso, who was nineteen years old when the crimes were committed.

[4] Defendant was denied parole on November 28, 1995, August 8, 2001, September 21, 2005, July 28, 2010, November 25, 2015, July 12, 2017, and December 18, 2019.

A-4368-19

Specifically, defendant appealed the Board's February 24, 2006 decision that denied parole and imposed an eighty-four-month FET. We affirmed. Thomas v. N.J. State Parole Bd., No. A-2649-05 (App. Div. Aug. 22, 2007). He next appealed the Board's May 25, 2011 decision that denied parole and imposed another eighty-four-month FET. We affirmed. Thomas v. N.J. State Parole Bd., No. A-5980-10 (App. Div. Dec. 14, 2012).

Defendant also appealed the Board's March 25, 2013 final decision that denied parole and imposed a 120-month FET. We found "the Board's decision [was] so wide of the mark and so fundamentally contradicted by the record," and reversed and remanded, directing the Board to reconsider defendant's eligibility for parole. Thomas v. N.J. State Parole Bd. (Thomas III), No. A-2943-13 (App. Div. Aug. 3, 2015) (slip op. at 18). We concluded that the record did not support the Board's determination that defendant was likely to commit a crime if released on parole.

In that regard, we noted that the Board had "failed to address the ten positive psychological evaluations performed on Thomas between[] 1991 and 2003[,] all of which consistently reported that Thomas had 'good insight' and maintained good impulse control and judgment." Id. at 17. We also concluded:

> In denying parole, the Board improperly relied on
> prior parole hearings not part of the record and

credited the summaries of Thomas's statements made by interested third parties over Thomas's own non-contradictory statements that he lacks memory of an event occurring over thirty years ago. Further, the Board illogically concluded that Thomas's false memory of the victims' drinking precludes him from having a lack of memory of other events.

Finally, the Board discounted positive reports and ignored the numerous positive psychological evaluations which contradicted the latest evaluation by [Richard Murcowski, Ph.D.]. We place little confidence in Murcowski's most recent report which inexplicably increased Thomas's recidivism score based on Thomas divorcing his wife and "new information available to this evaluator from the Parole Board interview." Not only is the report contradicted by the doctor's prior reports, but also the so-called "new information" is unidentified and not part of the record.

[Id. at 17-18.]

Regarding defendant's extensive rehabilitation efforts, we noted:

In 1988, Thomas began attending weekly group therapy for behavior modification and emotional control. In 1991, Thomas completed a substance abuse program and has been attending meetings on a regular basis since that time. That same year, Thomas was classified as gang minimum status, the lowest level of security classification for an inmate with a life sentence. Throughout his prison term Thomas completed about twenty multi-week programs for self-improvement on such topics as "Successful Employment and Lawful Living," "Cage Your Rage, Anger Manager," and "Substance Abuse Personality Awareness."

8

In addition to his extensive participation in self-help programs, Thomas earned a GED in 1993, a certificate in refrigeration in 1994 and completed various vocational training programs. Since at least 1996, Thomas worked as a twenty-four-hour on-call electrician at three different prisons repairing electrical equipment inside the prison including cell doors, switch motors, and the cell locking devices, with minimum supervision. His work supervisors have consistently praised Thomas for his ability to work with others and help inmates, and for "being a pleasure to have working in the shop."

Thomas underwent individual psychotherapy sessions beginning in 1992, and in 1993, when a staff shortage caused the therapy to be suspended, Thomas formally requested to be placed on a waiting list to continue the sessions once they became available again. The ten psychological evaluations performed on Thomas between[] 1991 and 2003 reported that Thomas[] had "no onset psychopathology," and "no sign of any psychiatric symptoms," with "good insight."

On December 20, 2000, Dr. David Gomberg, a New Jersey Department of Corrections psychologist at East Jersey State Prison, reported that Thomas had "participated in many programs," and maintained good impulse control and judgment. He referred Thomas for one on one psychotherapy to prepare him for parole. However, on September 3, 2003, Dr. Carlos Perez, another Department of Corrections psychologist at East Jersey State Prison, evaluated Thomas and at that time determined that he had "no need for individual therapy." Despite that conclusion, Thomas elected to attend over thirty individual rabbinical counseling sessions between 2003 and 2009.

[Id. at 4-6.]

On remand, the Board conducted a new hearing, including an extensive interview of defendant, and again denied defendant parole and imposed an eighty-four-month FET. Thomas v. N.J. State Parole Bd., No. A-3804-15 (App. Div. Feb. 8, 2017) (slip op. at 3-4). Defendant again appealed, and after affording the Board's decision "considerable deference," as we were required to do, we affirmed, noting that "[o]ur affirmance on the current record is compelled by our standard of review and the role entrusted to the Board." Id. at 10. The Supreme Court denied certification. State v. Thomas, 230 N.J. 588 (2017).

Most recently, on December 16, 2020, the Board issued a final decision rejecting defendant's supplemental administrative appeal and upholding its December 2019 decision denying parole and imposing a sixty-month FET. The Board noted that it considered a number of factors, including defendant's "age at the time of the offense[,]" that he "has remained infraction free," and "that the Department of Corrections psychiatrist has determined that [defendant] is a low risk for violence and recidivism." Despite these considerations, the Board noted as reasons for parole denial: (1) the "facts and circumstances of the offense;" and (2) defendant exhibited insufficient problem resolution and lack of insight into his criminal behavior. The Board further explained: "In the past, [defendant] consistently avoided

acknowledging his criminal actions to himself and others. However, due to a serious health concern, [defendant] only recently claims he had an epiphany and now he has no fear of telling the truth." Defendant's appeal of that decision is still pending. Thomas v. N.J. State Parole Bd., No. A-1262-20.

In the aggregate, the seven FETs that defendant received totaled forty-eight years. He is currently eligible for parole on December 11, 2022, when he will be fifty-nine years old. Defendant's custody status has been gang minimum[5] since June 8, 2007. His murder convictions do disqualify him from full minimum custody status. See Jenkins v. Fauver, 108 N.J. 239, 254-55 (1987) (observing that only sex offenders, arsonists, and escapees are categorically excluded from consideration for reduced custody status and recognizing that an inmate convicted of homicide is not disqualified from such consideration); Smith v. Dep't of Corrections, 346 N.J. Super. 24, 30-32 (App. Div. 2001) (same).

---

[5] There are six categories of custody status within the New Jersey Department of Corrections. N.J.A.C. 10A:9-4.1(a). Gang minimum custody status is one step more restrictive than "full minimum custody status," which, other than community custody, is the least restrictive category of custody. N.J.A.C. 10A:9-4.6(a). "Inmates classified as 'gang minimum custody status' may be assigned to activities or jobs . . . outside the security perimeter of the correctional facility, but on the grounds of the facility and under continuous supervision of a custody staff member, civilian instructor or other employee authorized to supervise inmates." N.J.A.C. 10A:9-4.3(d).

In September 2018, defendant filed his second motion to correct an illegal sentence. Defendant later withdrew the motion without prejudice.

On February 21, 2020, defendant filed a motion for a <u>Miller</u> hearing "to correct an unconstitutional sentence." In his brief and appendix, defendant included data from the Board, which he argued showed that being eligible for parole was not the same as having a "meaningful opportunity for release." Defendant argued that although his sentence was life with no specified period of parole ineligibility, he was serving the practical equivalent of life without parole, which was not the intent of the sentencing judge.

In support of his arguments, defendant submitted "undisputed parole data" regarding inmates, like himself, who received life in prison terms with no period of parole ineligibility. Defendant pointed out that from January 1, 2019, to December 31, 2019, over 90 percent of the 445 inmates who were sentenced to life in prison that appeared before the Board were denied parole.

Defendant also emphasized that he has "a perfect institutional record" and "is a trusted inmate." He claimed that he "has accepted full responsibility for his horrific conduct" and that he has "attended institutional programs and therapy" for over thirty-eight years. Notwithstanding his institutional record, he pointed out that his "youth" and "attendant circumstances" have never been considered by the Board.

A-4368-19

In response, the State argued that "none of the parole data" cited by defendant had "any relevance" to whether defendant's original sentence was illegal. The State did not address the accuracy of the data. The State maintained defendant was not entitled to a Miller/Zuber[6] hearing because his original sentence was neither life without parole nor "the practical equivalent of life without parole."

On August 3, 2020, the trial court issued an order and written decision denying defendant's motion. The judge noted that defendant had never received an institutional infraction and the psychological evaluations had opined that defendant was "a good fit for community release," did "not appear to be a risk," had "good impulse control," and is a "low risk for recidivism." In addition, "[t]he most recent psychological evaluation . . . concluded that defendant 'is a low risk to engage in future violent behavior.'"

The court further noted that the New Jersey Criminal Sentencing and Disposition Commission Annual Report (Nov. 2019) "unanimously acknowledged the need for sentencing reform regarding the issue of juvenile offenders." The court recognized that the Criminal Sentencing and Disposition Commission "recommended that 'an opportunity for sentencing or release [be

---

[6] State v. Zuber, 227 N.J. 422 (2017).

afforded] for offenders who were juveniles at the time of their offense and were sentenced as adults to long prison terms.'"

Based on the sentencing judge's reasoning, the court found "that he took defendant's age and potential for rehabilitation into consideration" and "that this was done with the intention that defendant would be eligible for parole and released, in theory, as soon as good behavior allowed.  However, in effect, and for reasons which could not have been anticipated by the sentencing court, defendant has yet to be released on parole."

The court noted that it did not have the authority to review Appellate Division or Board decisions.  While crediting the parole data submitted by defendant and acknowledging that the "continued incarceration of defendant at the hands of the Parole Board did not seem to be the intention of [the sentencing judge]," the court nonetheless concluded:

> [D]efendant's initial sentence is not within the purview of Miller, [Graham v. Florida, 560 U.S. 48 (2010)], or Zuber, and is more appropriately addressed by [State v. Bass, 457 N.J. Super. 1 (App. Div. 2018)]. Defendant is not ineligible for parole at the time of the present motion.  He became eligible for parole within fifteen years of his life sentences at the approximate age of thirty and has been eligible for parole since 1995.  While not all of the Miller factors may have been considered in defendant's initial sentencing, this was through no fault of the sentencing court but rather the lack of legal precedent and accepted medical science regarding differentiation between juvenile and adult capability.  Unfortunately, despite Zuber's

urging of the Legislature to mandate a system to review lengthy juvenile sentences, at this time there is no such system in place for this court to review defendant's juvenile sentence as none of the above legal precedent supports reconsideration of a life sentence without a mandatory period of parole ineligibility, especially in the present case where defendant has been eligible for parole since the approximate age of thirty. To grant defendant a Miller hearing would expand the Supreme Court and Appellate Division's holding far too greatly and at this time, there is simply nothing in place to support doing so based on the fact that defendant is still incarcerated despite being eligible for parole twenty-five years ago.

Legal precedent only allows for this court's jurisdiction over defendant's sentence, which again, is not appropriate for reconsideration under the Miller factors. The issue here is not defendant's sentence, but rather the practices of the Parole Board, an issue which falls within the jurisdiction of the Appellate Division. Based on the extensive appendices and exhibits provided by defendant, he appears to demonstrate maturity and rehabilitation and has an outstanding record of good behavior free of any infractions. However, it is outside of this court's jurisdiction to review the decision of the Parole Board or to mandate reform of its decision-making process. Even assuming arguendo that this court granted defendant a Miller/Zuber hearing, short of ordering defendant be immediately released, defendant would still be at the mercy of the Parole Board.

Unfortunately, unless and until there is more expansive precedent or a clear and mandated system of review for all lengthy juvenile sentences, there are no grounds for relief available to defendant under the holdings of Miller, Graham or Zuber.

This appeal followed. Defendant raises the following points:

15

POINT I

STATE V. BASS, RELIED UPON BY THE TRIAL COURT IN DENYING A MILLER HEARING, IS NOT APPLICABLE TO DEFENDANT'S LIFE SENTENCE BECAUSE THE PAROLE DATA CLEARLY INDICATES THAT BEING ELIGIBLE FOR PAROLE DOES NOT PROVIDE A MEANINGFUL AND REALISTIC OPPORTUNITY FOR RELEASE, BASED UPON DEMONSTRATED MATURITY AND REHABILITATION, AS MANDATED BY ZUBER, MILLER, THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, ¶ 12 OF OUR STATE CONSTITUTION.

A. UNITED STATES SUPREME COURT PRECEDENT.

B. THE ZUBER OPINION AND OUR STATE CONSTITUTION.

C. BASS WAS DECIDED CONTRARY TO THE HOLDING OF OUR SUPREME COURT IN STATE V. ZUBER, AND THEREFORE ZUBER IS CONTROLLING PRECEDENT, NOT BASS.

    1. The Bass decision impermissibly used life-expectancy tables to define a meaningful opportunity for release.

    2. Bass incorrectly declared the consideration of rehabilitative efforts to be exclusively within the province of the Parole Board.

D. THE PAROLE DATA REVEALS THAT MERE ELIGIBILITY FOR PAROLE DOES NOT AMOUNT TO A MEANINGFUL OPPORTUNITY FOR RELEASE PURSUANT TO GRAHAM V. FLORIDA, AND PRESENTS THE DE FACTO REALITY THAT

16 <span>A-4368-19</span>

MR. THOMAS WILL NEVER BE RELEASED WITHOUT JUDICIAL INTERVENTION.

    1. The Parole Board contravenes the intentions and expectations of sentencing judges.

    2. The Parole Board's decision-making process is statutorily and constitutionally deficient.

    3. Eligibility for parole does not equate to a meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation.

E. UNDER THE ANALYSIS SET FORTH IN MILLER AND ZUBER, JUVENILE OFFENDERS WHO HAVE SERVED MORE THAN [THIRTY] YEARS IN PRISON, LIKE MR. THOMAS, ARE ENTITLED TO A RESENTENCING.

POINT II

A MEANINGFUL OPPORTUNITY TO OBTAIN RELEASE BASED ON DEMONSTRATED MATURITY AND REHABILITATION REQUIRES A PROCESS THAT ACTUALLY AND PREDICTABLY RELEASES PEOPLE WHO HAVE MATURED AND REHABILITATED.

A. THE OPPORTUNITY FOR RELEASE MUST BE MEANINGFUL AND REALISTIC, AND A REMOTE POSSIBILITY FOR RELEASE IS INSUFFICIENT.

B. A GRAHAM-COMPLIANT SYSTEM MUST PREDICTABLY RELEASE JUVENILE OFFENDERS WHO DEMONSTRATE MATURITY AND REHABILITATION.

POINT III

17

THE SENTENCING COURT DID NOT PROPERLY CONSIDER THE MITIGATING ASPECTS OF YOUTH FOR DETERMINING WHETHER MR. THOMAS WAS ONE OF THE RARE JUVENILE OFFENDERS WHOSE CRIMES REFLECT IRREPARABLE CORRUPTION.

We first review the holdings, constitutional analysis, and intended import of Graham, Miller, Montgomery v. Louisiana, 577 U.S. 190 (2016), Jones v. Mississippi, ___ U.S. ___, 141 S. Ct. 1307 (2021), Zuber, and their progeny.

In Miller, the Court noted that "adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." 567 U.S. at 472 n.5. The court held that a juvenile who commits a homicide may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencing judge has discretion to "consider the mitigating qualities of youth" and impose a lesser punishment. 567 U.S. at 462. The Miller Court mandated "that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a life-without-parole sentence. Id. at 483. The Court outlined five factors ("the Miller factors") to be considered by sentencing judges, stating:

> Mandatory life without parole for a juvenile

A-4368-19

[1] precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.

[2] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.

[3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.

[4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

[5] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

[Id. at 477-78.]

While the Court did not "foreclose" life without parole for juveniles convicted of murder, it required sentencing judges "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. at 480. It expected that life without parole sentences "will be uncommon" because of the difficulty in concluding that a juvenile is irreparably corrupt. Id. at 479.

19

In Montgomery, the Court held that Miller established "a substantive rule of constitutional law" that applied retroactively to cases on collateral review. 577 U.S. at 208. However, "Miller did not require trial courts to make a finding of fact regarding a child's incorrigibility." Id. at 211.

Most recently, the Court rejected the argument that the sentencing judge must make a finding of permanent incorrigibility. Jones, 141 S. Ct. at 1311. Jones murdered his grandfather when he was only fifteen years old. Id. at 1312. Under Mississippi law, the mandatory sentence for murder was life without parole. Ibid. Jones later moved for post-conviction relief, contending that his mandatory life-without-parole sentence violated the Cruel and Unusual Punishments Clause of the Eighth Amendment. Ibid.

The Court noted that "Miller held that the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits mandatory life-without-parole sentences for murderers under eighteen, but the Court allowed discretionary life-without-parole sentences for those offenders." Ibid. (emphasis in original). "[T]he Fourteenth Amendment incorporates the Cruel and Unusual Punishments Clause against the States." Id. at 1314.

The Court concluded "that permanent incorrigibility is not an eligibility criterion akin to sanity or a lack of intellectual disability." Id. at 1315. "[T]he Court has recognized that it 'is difficult even for expert psychologists to

20

differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'"  Id. at 1315 (quoting Roper v. Simmons, 543 U.S. 551, 573 (2005)).  "Miller declined to characterize permanent incorrigibility as such an eligibility criterion.  Rather, Miller repeatedly described youth as a sentencing factor akin to a mitigating circumstance."  Ibid.  "Miller in turn required a sentencing procedure similar to the procedure . . . required for the individualized consideration of mitigating circumstances in capital cases . . . ."  Ibid.

"In the wake of Miller, the Mississippi Supreme Court . . . ordered a new sentencing hearing where the judge could consider Jones's youth and exercise discretion in selecting an appropriate sentence."  Id. at 1312-13.  On resentencing, the judge determined that life without parole remained the appropriate sentence.  Id. at 1313.

The United States Supreme Court has repeatedly "stated that youth matters in sentencing."  Ibid.  In Roper, the Court held that the Eighth Amendment prohibits capital punishment for murderers who were under eighteen when they committed their crimes.  543 U.S. at 578.  The Court recognized three basic differences between juveniles and adults.  Id. at 569.  First, because of "[a] lack of maturity and an underdeveloped sense of

A-4368-19

responsibility," juveniles are more likely to engage in "impetuous and ill-considered actions" and "reckless behavior." Ibid. (citations omitted); accord State in Interest of C.K., 233 N.J. 44, 68-70 (2018). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Ibid.; accord Zuber, 227 N.J. at 440. Third, "the character of a juvenile is not as well formed as that of an adult. The personality traits are more transitory, less fixed." Id. at 570; accord C.K., 233 N.J. at 69. Consequently, there is "a greater possibility . . . that a minor's character deficiencies will be reformed." Ibid.

In Graham, the Court held that the Eighth Amendment prohibits life without parole for juvenile offenders who committed non-homicide offenses. 560 U.S. at 82. The Court noted that research showed "fundamental differences between juvenile and adult minds." Id. at 68. A key difference is that "parts of the brain involved in behavior control continue to mature through late adolescence." Ibid. As a result, "[j]uveniles are more capable of change than are adults, and their actions less likely to be evidence of 'irretrievably depraved character.'" Ibid. (quoting Roper, 543 U.S. at 570). Although "[a] State is not required to guarantee eventual freedom to" juvenile offenders, the State must "give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 75. The Court left

22

it to "the State, in the first instance, to explore the means and mechanisms for compliance." Ibid.

In Jones, the Court made clear that it was not limiting the State's ability to impose more rigorous sentencing procedures:

> Importantly, like Miller and Montgomery, our holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under [eighteen] convicted of murder. States may categorically prohibit life without parole for all offenders under [eighteen]. Or States may require sentencers to make extra factual findings before sentencing an offender under [eighteen] to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States . . . . Indeed, many States have recently adopted one or more of those reforms . . . . But the U.S. Constitution, as this Court's precedents have interpreted it, does not demand those particular policy approaches.
>
> [Jones, 141 S. Ct. at 1323 (citations omitted).]

Finally, the Court recognized that Jones contended that he had "maintained a good record in prison and that he is a different person now than he was when he killed his grandfather." Ibid. The Court stated that its "decision allows Jones to present those arguments to the state officials authorized to act on them, such as the state legislature, state courts, or

23

[g]overnor. Those state avenues for sentencing relief remain open to Jones, and they will remain open to him for years to come." Ibid.

In Zuber, the defendants, who committed their violent crimes when they were juveniles, were sentenced to lengthy consecutive sentences with long periods of parole ineligibility. 227 N.J. at 428. One would not be eligible for parole until age seventy-two, the other would be eighty-five years old when first eligible for parole. Ibid. Our Supreme Court extended the Miller factors "to sentences that are the practical equivalent of life without parole," focusing "on the amount of real time a juvenile will spend in jail and not on the formal label attached to his sentence." Id. at 429. The Court "direct[ed] that [the] defendants be resentenced and that the Miller factors be addressed at that time." Ibid.

The Court emphasized that the focus when sentencing a juvenile "belongs on the real-time consequences of the aggregate sentence. To that end, judges must evaluate the Miller factors when they sentence a juvenile to a lengthy period of parole ineligibility for a single offense. They must do the same when they . . . determine the length of [an] aggregate sentence." Id. at 447.

"A defendant may challenge an illegal sentence at any time." Id. at 437 (citing R. 3:21-10(b)(5); State v. Acevedo, 205 N.J. 40, 47 n.4 (2011)). A

sentence that is "imposed without regard to a constitutional safeguard" is illegal.  Ibid. (quoting State v. Tavares, 286 N.J. Super. 610, 618 (App. Div. 1996)).

Most recently, in Comer, our Supreme Court revisited "the constitutional limits that apply to sentences for juvenile offenders." ___ N.J. at ___ (slip op. at 4).  The Court began its analysis by recognizing:

> The law recognizes what we all know from life experience -- that children are different from adults. Children lack maturity, can be impetuous, are more susceptible to pressure from others, and often fail to appreciate the long-term consequences of their actions. Miller, [567 U.S. at 477].  They are also more capable of change than adults.  Graham, [560 U.S. at 68].  Yet we know as well that some juveniles -- who commit very serious crimes and show no signs of maturity or rehabilitation over time -- should serve lengthy periods of incarceration.
>
> The issue before the Court is how to meld those truths in a way that conforms to the Constitution and contemporary standards of decency.  In other words, how to impose lengthy sentences on juveniles that are not only just but that also account for a simple reality: we cannot predict, at a juvenile's young age, whether a person can be rehabilitated and when an individual might be fit to reenter society.
>
> [Ibid.]

James Comer committed four armed robberies, one of which resulted in felony murder, when he was a juvenile.  Id. at ___ (slip op. at 8).  After successfully challenging his original aggregated term of 75 years as

unconstitutional under Miller, he was resentenced to 30 years without the possibility of parole, the mandatory minimum sentence for felony murder under N.J.S.A. 2C:11-3(b)(1). Id. at ___ (slip op. at 5, 10).

James C. Zarate committed purposeful murder when he was fourteen years old, and was sentenced to life, subject to the 85-percent period of parole ineligibility imposed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Id. at ___ (slip op. at 5, 16). He also received consecutive four- and nine-year terms for two other offenses. Id. at ___ (slip op. at 16). Zarate will first be eligible for parole after serving more than forty years. Id. at ___ (slip op. at 5). Zarate was later resentenced to life in prison with no consecutive terms. Id. at ___ (slip op. at 18). On a second remand, Zarate was resentenced to a 50-year NERA term. Id. at ___ (slip op. at 21). We modified and affirmed his sentence, but "declined to foreclose the possibility that Zarate might one day be able to return to court to show 'that he has sufficiently reformed himself to a degree that' his sentence is 'no longer . . . constitutional under the Eighth Amendment.'" Id. at ___ (slip op. at 21-22) (alteration in original).

Comer and Zarate "argued that their sentences violated federal and state constitutional provisions that bar cruel and unusual punishment. See U.S. Const. amend. VIII; N.J. Const. art. I, ¶ 12." Id. at ___ (slip op. at 5). They contended that the mandatory minimum sentence of thirty years without parole

A-4368-19

required by N.J.S.A. 2C:11-3(b)(1), is unconstitutional when applied to juveniles. Ibid.

The Court "decline[d] to strike that aspect of the homicide statute." Ibid. The Court found it was "obligated to address the constitutional issue the parties present[ed] and [could not] wait to see whether the Legislature will act, as the State request[ed]." Ibid. Noting the Judiciary's responsibility to determine whether sentencing statutes are constitutional and that "courts also have the authority to act to protect statutes from being invalidated on constitutional grounds[,]" the Court concluded that "the statutory framework for sentencing juveniles, if not addressed, will contravene Article I, Paragraph 12 of the State Constitution." Id. at ___ (slip op. at 6).

The Court explained that to determine whether a sentence is cruel and unusual, an independent analysis under Article I, Paragraph 12 of the New Jersey Constitution is appropriate. Id. at ___ (slip op. at 25) (citing State v. Ramseur, 106 N.J. 123, 182 (1987)).

> The test under [the federal and state] Constitutions is "generally the same": "First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?" Zuber, 227 N.J. at 438 (quoting Ramseur, 106 N.J. at 169). If the punishment fails under any one of the

27

three inquiries, "it is invalid." State v. Gerald, 113 N.J. 40, 78 (1988).

[Ibid.]

As it has in other contexts, the Court instructed that "[a]lthough the test is similar under federal and state law, our State Constitution can confer greater protection than the Eighth Amendment affords." Id. at ___ (slip op. at 26).

The Court noted that collectively, the United States Supreme Court opinions about juvenile sentencing since 2005 "establish that children are constitutionally different from adults for purposes of sentencing." Id. at ___ (slip op. at 26) (quoting Miller, 567 U.S. at 471). The Court further noted what we outlined above, that those decisions recognized "[t]hree general differences between juveniles under 18 and adults, [which] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." Id. at ___ (slip op. at 27) (alterations in original) (quoting Roper, 543 U.S. at 569). First, "juveniles are less mature and responsible than adults." Ibid. (citing Roper, 543 U.S. at 569). Second, "[j]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure" and "have less control . . . over their own environment." Ibid. (quoting Roper, 543 U.S. at 569). Third, "'the character of a juvenile is not as well formed as that of an adult,' and . . . juveniles' 'personality traits . . . are more transitory, [and] less fixed.'" Ibid. (alterations

28

in original) (quoting Roper, 543 U.S. at 570).  "Taken together, the differences tell us that a juvenile's 'irresponsible conduct is not as morally reprehensible as' the behavior of an adult."  Ibid. (quoting Roper, 543 U.S. at 570).

The Court further noted that "Zuber underscored one of Graham's concerns: the inability to determine at the moment of sentencing whether a juvenile might one day be fit to reenter society."  Id. at ___ (slip op. at 32) (citing Zuber, 227 N.J. at 451).  The Court continued with how Zuber recognized "that some 'juveniles will receive lengthy sentences with substantial periods of parole ineligibility' and may well return to court decades later to challenge the constitutionality of their sentence" and "'might ask the court to review factors that could not be fully assessed when they were originally sentenced -- like whether they still fail to appreciate risks and consequences, or whether they may be, or have been, rehabilitated.'"  Id. at ___ (slip op. at 32-33) (alterations to plural in original) (quoting Zuber, 227 N.J. at 451-52).

Recognizing that such claims "would raise serious constitutional issues about whether sentences for crimes committed by juveniles, which carry substantial periods of parole ineligibility, must be reviewed at a later date," the Zuber Court "encourage[d] the Legislature to examine [the] issue" and "consider enacting a scheme that provides for later review of juvenile

A-4368-19

sentences with lengthy periods of parole ineligibility." Id. at ___ (slip op. at 33) (alterations in original) (quoting Zuber, 227 N.J. at 452-53). The Court noted that in the intervening years since 2017, "a number of bills relating to the issue have been introduced or reintroduced in the Legislature." Ibid. None of those bills, including A. 4372 (June 29, 2020)/ S. 2591 (June 22, 2020) (allowing juveniles sentenced to 30 years or more who have served at least 20 years to petition for resentencing), were enacted.

The Court also recognized that "[o]ther states have also addressed lengthy mandatory minimum sentences and parole bars for juvenile offenders" and noted that thirteen states and the District of Columbia had enacted "statutes that allow juvenile offenders to be considered for release before 30 years have passed. Some states afford juveniles a chance at parole; others grant them an opportunity to be resentenced." Id. at ___ (slip op. at 34). In addition, the Iowa and Washington Supreme Courts have "issued rulings that ban mandatory minimum sentences for juvenile offenders." Id. at ___ (slip op. at 37); see State v. Lyle, 854 N.W.2d 378, 380 (Iowa 2014); State v. Houston-Sconiers, 391 P.3d 409, 414 (Wash. 2017).

The Court then turned to the facts, noting that Comer and Zarate were sentenced under a statute that required them to serve a minimum of thirty years in prison with no possibility of parole. Id. at ___ (slip op. at 40). The court

30

A-4368-19

reiterated that a sentencing court "cannot determine at the outset that a juvenile will never be fit to reenter society," and that "it is difficult even for experts to assess whether a juvenile's criminal behavior is a sign of transient immaturity or irreparable corruption." Id. at ___ (slip op. at 41-42) (first citing Graham, 560 U.S. at 75, then citing Roper, 543 U.S. at 573).

The Court further noted that "[t]he Legislature fixed the maximum sentence in the Family Part for a juvenile found to have committed murder at 20 years." Id. at ___ (slip op. at 42) (citing N.J.S.A. 2A:4A-44(d)(1)(a)). "In addition, the Legislature recently amended the sentencing statute, which now requires judges to consider youth as a mitigating factor at the time of sentencing." Ibid. (citing N.J.S.A. 2C:44-1(b)(14) ("The defendant was under 26 years of age at the time of the commission of the offense.")). The Legislature also "amended the waiver statute to raise the minimum age for a juvenile to be waived to adult court from 14 to 15," N.J.S.A. 2A:4A-26.1(c)(1), and "eliminated life-without-parole sentences for juveniles in response to Zuber." Id. at ___ (slip op. at 43) (citing L. 2017, c. 150, § 1 (codified at N.J.S.A. 2C:11-3(b)(5))). "When a juvenile is sentenced to a 30-year term under N.J.S.A. 2C:11-3(b)(1), however, no consideration can be given to the person's youthful status." Ibid. The court concluded that these statutory changes, case law, and other sources "suggest that a 30-year parole

31

bar does not conform to contemporary standards of decency." <u>Id.</u> at \_\_\_ (slip op. at 44).

Regarding the second prong, whether the punishment is grossly proportional to the offense, the Court explained that "[b]ecause children lack maturity and responsibility," a juvenile's "misconduct is not as morally culpable as an adult's." <u>Id.</u> at \_\_\_ (slip op. at 45) (citing <u>Roper</u>, 543 U.S. at 569-70). Therefore, judges must "consider mitigating qualities of youth that reflect their diminished culpability." <u>Ibid.</u> This diminished culpability "suggests that the severity of a 30-year parole bar for juveniles, in many cases, may be grossly disproportionate to the underlying offense." <u>Id.</u> at \_\_\_ (slip op. at 46).

The third prong examines "whether 'the punishment go[es] beyond what is necessary to accomplish any legitimate penological objective.'" <u>Id.</u> at \_\_\_ (slip op. at 47) (alteration in original) (quoting <u>Zuber</u>, 227 N.J. at 438). "[B]ecause of the diminished culpability of juveniles, the traditional penological justifications -- retribution, deterrence, incapacitation, and rehabilitation -- 'apply . . . with lesser force than to adults.'" <u>Ibid.</u> (second alteration in original) (quoting <u>Roper</u>, 543 U.S. at 571). The Court noted that retribution does not apply with equal strength to juveniles and that "the threat of a lengthy jail sentence is less of a deterrent for juveniles than adults." <u>Ibid.</u>

A-4368-19

Moreover, "[t]he core rationale for incapacitation is the need to protect the public. Yet even experts . . . cannot predict whether a juvenile's criminal behavior 'reflects unfortunate yet transient immaturity' or the 'rare' situation of a minor who is 'irreparabl[y] corrupt[].'" Id. at ___ (slip op. at 48) (second and third alterations in original) (quoting Roper, 543 U.S. at 573).

Important to this case, the Court emphasized that "[r]esearch reveals that most juveniles desist from crime before 30 years have passed from the time of their offense. Scientists refer to that as the 'age-crime curve,' which shows 'that more than 90% of all juvenile offenders desist from crime by their mid-20s.'" Ibid. (quoting Laurence Steinberg, The Influence of Neuroscience on U.S. Supreme Court Decisions about Adolescents' Criminal Culpability, 14 Neuroscience 513, 516 (2013)). The Court concluded that "[t]he 'age-crime curve' is at odds with the notion that juveniles, as a category of offenders, must be incapacitated for several decades to protect the public." Id. at ___ (slip op. at 49).

Regarding rehabilitation, the Court recognized that "a child's brain matures as the child grows older, including parts of the brain involved in impulse control" and that "juveniles are also more capable of change than adults." Ibid. (citations omitted). "A mandatory period of three decades in prison does not foster that type of growth or change. Nor does it serve to

33

A-4368-19

rehabilitate young adults in the way the State's juvenile justice system does." Ibid. The Court concluded that "[r]ehabilitation cannot justify mandatory minimum sentences of 30 years for juveniles regardless of the individual facts and circumstances of a case." Id. at ___ (slip op. at 50).

The Court described the twofold constitutional concern as: "the [sentencing] court's lack of discretion to assess a juvenile's individual circumstances and the details of the offense before imposing a decades-long sentence with no possibility of parole; and the court's inability to review the original sentence later, when relevant information that could not be foreseen might be presented." Ibid. "Allowing minors a later opportunity to show they have matured, to present evidence of their rehabilitation, and to try to prove they are fit to reenter society would address the problem posed." Id. at ___ (slip op. at 51).

"To remedy the concerns defendants raise[d] and save the [homicide] statute from constitutional infirmity," the Court held that "juvenile offenders convicted under the law" will be permitted "to petition for a review of their sentence after they have served two decades in prison." Id. at ___ (slip op. at 6). "At that time, judges will assess" the Miller factors, "which are designed to consider the 'mitigating qualities of youth.'" Ibid. (quoting Miller, 567 U.S. at 476-78).

The Court adopted the following procedure:

> At the hearing, the trial court will assess factors it could not evaluate fully decades before -- namely, whether the juvenile offender still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated. The court may also consider the juvenile offender's behavior in prison since the time of the offense, among other relevant evidence.
>
> After evaluating all the evidence, the trial court would have discretion to affirm or reduce the original base sentence within the statutory range, and to reduce the parole bar to no less than 20 years. A juvenile who played a central role in a heinous homicide and then had a history of problematic behavior in prison, and was found to be incorrigible at the time of the later hearing, would be an unlikely candidate for relief. On the other hand, a juvenile who originally acted in response to peer pressure and did not carry out a significant role in the homicide, and who presented proof at the hearing about how he had been rehabilitated and was now fit to reenter society after two decades, could be an appropriate candidate for a lesser sentence and a reduced parole bar.
>
> [Id. at ___ (slip op. at 6-7).]

During the hearing, "[b]oth parties may also present additional evidence relevant to sentencing." Id. at ___ (slip op. at 53). "In particular, the trial court should consider evidence of any rehabilitative efforts since the time a defendant was last sentenced." Id. at ___ (slip op. at 53-54). The Court held that Comer was entitled to be resentenced again, even though the Miller factors were considered during his prior resentencing. Id. at ___ (slip op. at

57).  As to Zarate, the Court held he was "to be sentenced anew with an appropriate application of the Miller factors."  Id. at ___ (slip op. at 58).

Guided by these principles, we engage in the following analysis to determine if Thomas, whose sentence did not incorporate a lengthy period of parole ineligibility, but has now served more than forty years in prison due to repeated parole denials, is entitled to an adversarial, evidentiary hearing under Comer, with representation by appointed counsel, to afford him a meaningful opportunity to demonstrate that he now appreciates risks and consequences, has gained maturity, and has been rehabilitated.  We further consider whether defendant must be afforded the right to cross-examine the State's witnesses, and present witnesses, expert testimony, parole records (including post-sentencing psychological evaluations), and prison disciplinary records at the hearing.

We fully recognize that defendant perpetrated a horrific double murder when he was seventeen years old.  He pleaded non vult to the murder charges and under the statutes then in effect was sentenced to life, making him eligible for parole after serving thirteen years.  He has now served more than forty years in prison after being denied parole seven times and receiving lengthy FETs each time.  Yet during those four decades, defendant has committed no disciplinary infractions or new crimes.  He has participated in numerous

A-4368-19

rehabilitation programs, including treatment for substance abuse, behavioral modification, impulse control, and vocational training, and earned a GED. His inmate classification allows him to serve as an electrician at the prison where he is incarcerated. Defendant has an excellent work record. The State does not dispute that defendant has been a model prisoner.

In addition, defendant has undergone eighteen psychological evaluations while incarcerated, seventeen times by psychologists selected by the Department of Corrections. None of those evaluations have found him to be a high or moderate risk for reoffending. Indeed, Murcowski has twice found defendant to be a "low risk for recidivism." Three of the evaluations found him to be a low risk for future violent behavior, including the evaluations performed in 2016 and 2019.

While it is true that his parole denials have been ultimately affirmed on appeal, parole hearings fall far short of providing an adversarial hearing for defendant to demonstrate the degree of maturity and rehabilitation he has achieved while incarcerated. Defendant is not represented by counsel at the parole hearing and he cannot present witnesses or expert testimony. The Sixth Amendment right of confrontation and cross-examination have not been applied to hearings to determine if an inmate should be paroled. Thus, defendant can neither compel the appearance of the psychologists or other

37

experts whose reports are utilized by the Board to evaluate him, nor cross-examine them. Instead, their unchallenged hearsay psychological evaluation reports are considered and frequently relied upon by the Board. And, unlike appeals from other administrative agencies, inmates do not have the right to contest the Board's decision before an Administrative Law Judge (ALJ) before the Board issues a final decision.[7] Indeed, defendant does not even receive their reports, which are part of the confidential appendix that he is unable to inspect.

The importance of cross-examination is beyond dispute. In our system of justice, cross-examination is the "greatest engine ever invented for the discovery of truth." State v. Cope, 224 N.J. 530, 554 (2016) (quoting California v. Green, 399 U.S. 149, 158 (1970)); see also Chambers v. Mississippi, 410 U.S. 284, 295 (1973) (stating that cross-examination "helps

---

[7] Moreover, in proceedings before an ALJ, parties can cross-examine expert witnesses presented by the agency. In addition, the residuum rule applies, which provides that "[s]ubject to the judge's discretion to exclude evidence under [N.J.A.C.] 1:1-15.5(c) or a valid claim of privilege, hearsay evidence shall be admissible in the trial of contested cases." N.J.A.C. 1:1-15.5(a). "Notwithstanding the admissibility of hearsay evidence, some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." N.J.A.C. 1:1-15.5(b). In contrast, even though the "evidence at parole hearings is frequently hearsay by nature[,] . . . the 'residuum evidence' rule does not apply" to hearings to determine if an inmate should be paroled. Gerardo v. N.J. State Parole Bd., 221 N.J. Super. 442, 452-53 (App. Div. 1987).

assure the 'accuracy of the truth-determining process'" (quoting <u>Dutton v. Evans</u>, 400 U.S. 74, 89 (1970))). In a related context, we described the greater risk of error when the record is limited to mostly written hearsay statements that are not subjected to cross-examination:

> It is also important to emphasize that there is a greater opportunity for an erroneous determination when the only information provided to the decision maker consists of written statements, which were not subject to cross-examination, and when the individual whose liberty interest is at stake has had no opportunity to know of the contents of the statements or to provide his own testimony or other evidence in response.
>
> [<u>Jamgochian v. N.J. State Parole Bd.</u>, 394 N.J. Super. 517, 535 (App. Div. 2007), <u>aff'd as modified</u>, 196 N.J. 222 (2008).]

Moreover, we apply a deferential standard of review of final Board decisions. <u>See</u> <u>Trantino v. N.J. State Parole Bd.</u>, 296 N.J. Super. 437, 470 (App. Div. 1997) ("The granting of parole is within the discretion of the Board, and we must give great deference to the expertise of the Board in its parole decisions and not upset them unless it clearly and convincingly appears that the Board has abused its discretion."). Whether a sentence is illegal as unconstitutional, however, is a question of law to which a reviewing court affords no deference. <u>Zuber</u>, 227 N.J. at 437.

By any measure, parole hearings are a poor substitute for a procedure that would afford defendant a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Zuber, 227 N.J. at 452 (quoting Graham, 560 U.S. at 75). This failure to provide a means for later review of his life sentence effectively precludes defendant from having a court consider his rehabilitative efforts and the maturity he has gained in the intervening years and whether his sentence has become the practical equivalent of life without parole. While Montgomery allows a Miller violation to be remedied by consideration for parole, consideration for parole standing alone does not remedy the violation, particularly where the record supports a finding that the defendant is not incorrigible and has served decades in prison.

Miller established a new rule of substantive constitutional law. Graham and Zuber embraced the concept of having a court review whether a defendant has matured and been rehabilitated during their lengthy incarceration. Zuber, 227 N.J. at 451-52. Tormasi recognized that in certain circumstances, an adversarial hearing may be needed to meet that goal. 466 N.J. Super. at 71. We did so without deciding "what would constitute an appropriate amount of time in prison to justify a 'return to court' to demonstrate that defendant has sufficiently reformed himself to a degree that serving his original sentence in full is no longer constitutional under the Eighth Amendment." Id. at 66.

A-4368-19

Comer created a procedure for juvenile offenders sentenced to the murder statute's mandatory 30-year parole bar to petition the court for a hearing after they have served at least twenty years in prison to "assess factors that the sentencing court could not evaluate fully decades before – namely, whether the juvenile offender still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated." Comer, ___ N.J. at ___ (slip op. at 6-7). At the hearing "[t]he court may also consider the juvenile offender's behavior in prison since the time of the offense, among other relevant evidence." Id. at ___ (slip op. at 7).

We now hold that defendant, who was sentenced to life in prison without a specified period of parole ineligibility and has been incarcerated for over forty years for crimes committed when a juvenile, has a blemish-free disciplinary record, has received numerous positive psychological evaluations, and has completed rehabilitative programs while incarcerated, is entitled to the same type of hearing adopted in Comer—an adversarial hearing in the Criminal Part to provide a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" achieved while imprisoned, Zuber, 227 N.J. at 452 (quoting Graham, 560 U.S. at 75), including consideration of whether defendant "still fails to appreciate risks and consequences," his "behavior in prison since the time of the offense," and "other relevant

41

evidence," <u>Comer</u>, ___ N.J. at ___ (slip op. at 6-7). "After evaluating all the evidence, the trial court [will] have discretion to affirm or reduce the original base sentence within the statutory range," <u>Comer</u>, ___ N.J. at (slip op. at 7), and, in turn, determine whether defendant should be released based on the time he has served.[8]

Defendant's constitutional rights in that regard are not satisfied by periodic parole hearings, which do not consider the <u>Miller</u> factors, and do not provide a constitutionally sufficient procedure and forum to adjudicate the important Federal and State constitutional issues presented. Parole hearings fall far short of the procedure contemplated in <u>Graham</u>, <u>Comer</u>, <u>Zuber</u>, and <u>Tormasi</u>.

Emblematic of the shortcomings of the parole hearings defendant has endured is the Board's unsustainable 2013 final decision, which included the following conclusions that were not supported by the record:

> Here, the Board singularly focused upon the admittedly horrific details of Thomas's crimes, and his "insufficient problem resolution" in the form of a contrived memory lapse, as evidence of likely recidivism.

---

[8] Defendant was sentenced under a former version of the murder statute, which did not have a mandatory parole bar, let alone a 30-year parole-bar. Therefore, his situation is different from Comer's. Under <u>Comer</u>, a defendant must serve twenty years before he can petition for resentencing. <u>Id.</u> at ___ (slip op. at 7). Thomas has far exceeded that twenty-year requirement.

. . . .

However, there is no evidence in the record to support the Board's contention that Thomas's lack of memory is less than genuine and, apart from the issue of recollection, the record is replete with evidence supporting his acknowledgement of responsibility of his crimes as sincere and legitimate. Psychological evaluations as far back as 1991 consistently report that Thomas accepted responsibility for his crimes even while claiming he was under the influence of drugs and alcohol and "lacked control over his actions." Additionally, Thomas's parole hearing testimony makes clear that Thomas accepts full responsibility for his crimes and possesses insight into his motivations for committing such horrific violent acts, namely that he was an angry, bullied, drug-addicted youth who resorted to violence to solve his problems. And now, as a fifty-year-old man who has attended programs and therapy for over thirty years, he is a different person who maintains control over his actions.

. . . .

Moreover, although the Board noted, as mitigating factors, Thomas's participation in programs and counseling, his vocational certifications, and his infraction-free status maintained throughout Thomas's entire prison stay, it failed to address the ten positive psychological evaluations performed on Thomas between[] 1991 and 2003 all of which consistently reported that Thomas had "good insight" and maintained good impulse control and judgment.

We conclude that the record here does not support the conclusion that recidivism is likely.

[Thomas III (slip op. at 14-17).]

Our criticisms of the parole process are confined to the distinctive setting of this case involving "heightened review" of the constitutionality of an extremely lengthy incarceration of a juvenile offender who has been a model prisoner. Our holding should not be construed as a generalized finding that the parole process is procedurally deficient or unfair.

We recognize that defendant was not sentenced to life without parole or life with a lengthy period of parole ineligibility and was eligible for parole after serving only thirteen years. "Nevertheless, a statutorily permissible sentence may still violate the constitutional prohibition against cruel and unusual punishment." Tormasi, 466 N.J. Super. at 62. We focus "on the amount of real time" defendant has spent in prison "and not on the formal label attached to his sentence." Zuber, 227 N.J. at 429.

Here, there is seemingly no end to defendant's imprisonment. Despite his exemplary behavior during more than forty years in prison, he has been denied parole seven times and received lengthy FETs each time. As we recognized in Tormasi, a defendant who "serves a substantial period in prison due to a parole denial or denials . . . may . . . have a basis to file a motion to correct an illegal sentence based on 'factors that could not be fully assessed when he was originally sentenced.'" 466 N.J. Super. at 71 (quoting Zuber, 227 N.J. at 452). The record establishes that defendant has met that threshold.

44

Defendant "must be given the opportunity to show [his crimes] did not reflect irreparable corruption" and thereby avoid cruel and unusual punishment. Zuber, 227 N.J. at 446 (quoting Montgomery, 577 U.S. at 213).

We also recognize that in Bass, we stated that a "defendant's sentence is not illegal because he claims to be rehabilitated as a result of his incarceration." 457 N.J. Super. at 14. The facts in Bass are distinguishable. Bass was sentenced to an aggregate sentence of life with thirty-five years of parole ineligibility. Id. at 4. Unlike in this case, Bass had not undergone a series of parole denials and lengthy FETs, and the case focused on whether the defendant was entitled to PCR, based on his argument that the revised waiver statute, N.J.S.A. 2A:4A-26.1(c), applied retroactively to his case. We rejected that argument and concluded that his sentence was not illegal. We also concluded that consideration of the defendant's efforts at rehabilitation was "exclusively the province of the parole board and not a means of collateral attack on [the] defendant's sentence—which has been affirmed on direct appeal." Id. at 14. The Bass court did not engage in a full analysis of whether the defendant's sentence violated the Federal or State constitutions. To the extent that Bass may be interpreted as barring a Miller/Zuber/Comer hearing under the facts of this case, we reject that conclusion. In any event, Bass does not comport with the holding in Comer.

A-4368-19

"The fundamental fairness doctrine is an integral part of the due process guarantee of Article I, Paragraph 1 of the New Jersey Constitution, which protects against arbitrary and unjust governmental action." State v. Njango, 247 N.J. 533, 537 (2021); accord Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 239 (2008). "The doctrine serves as 'an augmentation of existing constitutional protections or as an independent source of protection against state action.'" State v. Melvin, 248 N.J. 321, 348 (2021) (quoting Doe v. Poritz, 142 N.J. 1, 108 (1995)). It advances "fairness and fulfillment of reasonable expectations" relating to "constitutional and common law goals." Njango, 247 N.J. at 549 (quoting State v. Vega-Larregui, 246 N.J. 94, 132 (2021)).

We rely, in part, on the fundamental fairness doctrine to resolve the "especially compelling" issue before us. See State v. Saavedra, 222 N.J. 39, 67 (2015) (noting that "[t]he doctrine is applied 'sparingly' and only where the 'interests involved are especially compelling' . . . ." (quoting Doe, 142 N.J. at 108)). As we have explained, defendant's confinement seems to have no end, and that is due, to a large extent, to the confluence of the following: precedent that allows the consideration for parole to remedy a Miller violation; precedent that removes his sentence from the realm of de facto life terms; and the deferential standard of review applied to parole denials. To this point in time,

these legal concepts have hindered defendant's ability to obtain the review to which he is constitutionally entitled. Fundamental fairness requires relief.

Although defendant was not sentenced to a lengthy period of parole ineligibility, his sentence has, as a practical matter, evolved into just that, despite the significant rehabilitated steps he has taken, his blemish-free record while incarcerated, and the positive psychological evaluations he has received. Considering the record in this matter, nothing less than an adversarial hearing in the Criminal Part will afford defendant the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" envisioned by Graham, 560 U.S. at 75, Comer, ___ N.J. at ___ (slip op. at 6-7), and Zuber, 227 N.J. at 452. We therefore reverse the order denying defendant's motion to correct an illegal sentence without conducting an adversarial hearing.[9] Because defendant has already petitioned for the very adversarial hearing that we hold he is entitled to, and appeals from the denial of that application, he need not file a new petition. We remand for the trial court to conduct an adversarial evidentiary hearing consistent with this opinion. At the hearing, defendant shall have the right to be represented by legal counsel, present witnesses and expert testimony, cross-examine the State's witnesses,

---

[9] In so ruling, we do not fault the trial court, which based its decision on then existing case law.

A-4368-19

and introduce his nonconfidential parole records and other relevant, admissible exhibits. We leave the admissibility of such records and exhibits and any request for discovery to the sound discretion of the trial court.

On remand, the court shall consider the <u>Miller</u> factors and determine whether defendant has demonstrated that he now appreciates risks and consequences and has achieved maturity and rehabilitation while imprisoned that warrants relief under the State Constitution. The parties shall keep the trial court abreast of the status of defendant's pending appeal of his parole denial.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4368-19